### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SHELBY D. SNYDER,**

      **Plaintiff,**

                                     **Civil Action 2:10-cv-00821**

**vs.**                                     **Judge Michael H. Watson**

                                     **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION

## I. INTRODUCTION

Plaintiff, Shelby D. Snyder, brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Plaintiff filed his current application for disability insurance benefits on February 2, 2004,[1] alleging that he has been disabled since October 1, 2003 due to a variety of conditions including heart problems.[2] (R. at 252–55.) Plaintiff's date last insured for the purposes of disability insurance was December 31, 2005. (R. at 31.) Plaintiff's application was denied initially and again upon reconsideration. Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ").

On April 25, 2007, ALJ Thaddeus J. Armstead Sr. held a hearing at which Plaintiff,

---

[1] Plaintiff filed a previous applications for disability insurance benefits on May 21, 2001. An administrative law judge denied this application on September 26, 2003.

[2] As relevant to this case, Plaintiff's February 2, 2004 application did not, however, list obesity as a condition limiting his ability to work.

represented by counsel, appeared and testified.  Medical and vocational experts also appeared and testified at the hearing.  On May 9, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision on June 25, 2009.  Plaintiff timely commenced this action.

This matter is before the Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition, and Plaintiff's Reply.  In his Statement of Errors, Plaintiff maintains that the ALJ failed to adequately consider his obesity and erred in rejecting the opinions of his treating physicians.  For the reasons that follow, it is **RECOMMENDED** that the Court affirm the decisions of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff was fifty-eight years old at the time of the administrative hearing and has a seventh-grade education.  (R. at 617, 619.)  He has past work experience as a machine operator, shipping and receiving clerk, and security guard.  (R. at 642–43.)  During the hearing, Plaintiff's counsel reported that the impairments forming the basis for Plaintiff's claims were his heart and shoulder problems, carpal tunnel syndrome, and claudication.  (R. at 620–21.)

At the hearing, Plaintiff testified to being five 5' 2" tall and weighing 210 pounds.  (R. at 617.)  He indicated that his weight ranged from 205 to 222 pounds.  (R. at 618.)  Plaintiff stated that he has pain throughout his entire body, including in his knees and shoulders.  (R. at 622.)  Plaintiff testified to being overtired and experiencing chest pain.  (R. at 622.)  He also reported having leg swelling for most of his life.  (R. at 627.)  Plaintiff testified to receiving stents due to heart problems.  (R. at 625–26.)

Plaintiff testified that he was able to drive short distances, but that his wife does most of the driving. (R. at 619.) According to Plaintiff, the most lifting he was able to do was to lift his twenty-one pound grandchild on to the couch. (R. at 622.) Plaintiff noted problems with gripping items during routine activities. (R. at 623.) He testified to being able to stand anywhere from 20 minutes to two hours, noting that he had recently stood two hours for a wedding, but was stiff afterward. (R. at 623–24.) He occasionally uses a cane. (R. at 624.) Plaintiff indicated that he mows his lawn with a riding lawnmower and babysits his grandchildren. (R. at 622.)

## III. MEDICAL RECORDS

A.    <u>Treatment Records</u>

Although within his current application Plaintiff alleges disability since October 1, 2003, the record reflects a history of coronary disease dating back to 2000. In 2000, Plaintiff had stents placed in his circumflex and right coronary arteries. (R. at 586.)

In January 2003, Plaintiff underwent surgery with Dr. Thomas C. Franklin for a meniscal tear to his right knee. (R. at 318, 321.) Plaintiff's medical records reflect that while he was initially doing well following surgery, he suffered a fall in late February re-aggravating his right knee and injuring his left knee. (R. at 323, 399, 403.) Plaintiff underwent arthroscopic surgery on his left knee in May 2003. (R. at 323.) In June 2003, Dr. Franklin reported that the surgeries had helped restore function, although he still noted some weakness in Plaintiff's quadriceps. (R. at 398.) Dr. Franklin also indicated that Plaintiff was doing extremely well following the surgeries in August 2003. (R. at 397.)

In August 2003, Dr. Franklin began focusing his treatment on Plaintiff's ongoing

shoulder pain. (R. at 396.) X-rays revealed "some degenerative changes in the glenohumeral joint that are mild and some AC joint arthropathy . . . ." (*Id.*) Dr. Franklin referred Plaintiff to Dr. Boris Terebuh to conduct an EMG. (R. at 390–92.) Upon physical examination Dr. Terebuth noted Plaintiff as having mesomorphic body habitus. (R. at 390.) The EMG revealed moderate left carpal tunnel syndrome and mild right carpal tunnel syndrome. (R. at 392.) Dr. Terebuh also opined that Plaintiff likely had cervical spondylosis and cervical nerve root compromise. (*Id.*) In September 2003, Dr. Terebuh noted that a cervical MRI displayed disc protrusion and degenerative changes at C4-5 and C6-7. (R. at 389.) On October 31, 2003, Plaintiff reported that extension and bending of his neck was still painful. (R. at 388.) In December 2003, Plaintiff indicated to Dr. Terbuh that injections had helped to some extent with his pain level. (R. at 387.)

Plaintiff saw Nurse Angela Rutan in December 2003. (*See* R. at 339, 563–68.) Upon initial examination, Nurse Rutan noted that Plaintiff was "short in stature with barrel chest and obtund abdomen." (R. at 340.) Nurse Rutan's impression included coronary artery disease, chest pain, and hypertension. (*Id.*) Plaintiff underwent a heart catheterization on December 17, 2003, and had re-stenosis of the circumflex stent. (R. at 344–56, 586.) The record reflects that on December 29, 2003 Plaintiff weighed approximately 215 pounds. (R. at 567.) At this time he reported some periods of shortness of breath. (*Id.*) Plaintiff followed up with Nurse Rutan in February 2004. (R. at 561–62.) At this time Plaintiff was off all cardiac medication and reported having one episode since his catherization. (*Id.*)

On May 5, 2004, Plaintiff underwent shoulder surgery and left carpal tunnel release. (R. at 418–20.) Shortly after this procedure, Plaintiff reported to Nurse Rutan that the procedure

4

helped his numbness, although his shoulder was still in pain.  (R. at 558.)  At this time, Plaintiff

weighed 212 pounds.  (*Id.*)  He indicated that his breathing was much better and that he was able

to do some yard work with frequent rest.  (*Id.*)  Plaintiff saw Nurse Rutan again in August and

September 2004.  (R. at 553–56.)  The records reflect that Plaintiff underwent carpal tunnel

released in December 2004, which improved numbness and tingling in his right hand.  (R. at

445.)  Plaintiff was scheduled for a shoulder arthoscopy at this time, but this procedure was

abandoned due to hypoxemia.  (*Id.*)

Plaintiff continued to receive treatment for various conditions in 2005.  Upon

examination in January 2005, Nurse Rutan found Plaintiff's complaints to be suggestive of sleep

apnea.  (R. at 551.)  On March 14, 2005, Nurse Rutan noted under general appearance that

Plaintiff had a  moderately overweight body habitus.  (R. at 549.)  In July 2005, Plaintiff

indicated that he was doing well with sleep apnea and denied shortness of breath.  (R. at 546.)

During the same month, Plaintiff reported improvement in his right hand to Dr. Franklin, but

indicated that his shoulder continued to bother him.  (R. at 445.)  On July 21, 2005, Dr. Franklin

performed right shoulder surgery on Plaintiff.  (R. at 453–54.)  A September 2005 anteriogram

revealed mild arterial occlusive disease on the right side, but no significant changes since

December 2003.  (R. at 462.)

On November 27, 2005, Plaintiff reported to the emergency room with chest pain.  (R. at

471.)  Following testing, Plaintiff's doctors, including Dr. William A. Houser, suspected a

myocardial infarction.  (R. at 472–78.)  On November 28, 2005, Plaintiff underwent another

heart catherization.  (R. at 504–07.)  This procedure demonstrated another episode of restenosis

of the circumflex stent, and Plaintiff had another stent placed.  (R. at 586.)

On December 13, 2005, Plaintiff visited Nurse Rutan for follow-up following his heart catherization.  (R. at 543.)  Plaintiff weighed approximately 208 pounds at this time and reported no chest pain.  (*Id.*)  Dr. Howser saw Plaintiff on December 28, 2005.  (R. at 532, 535.)  At this time, Plaintiff reported fatigue and tiredness since his surgery.  (R. at 535.)  He also reported some tightness and fluttering in his chest.  (*Id.*)  In January 2006, Dr. Howser noted that Plaintiff's ejection frame at the time of his 2005 heart catherization was 48%.  (R. at 532.)

Plaintiff attended cardiac rehabilitation in February and March 2006.  (R. at 578–80.)  During rehabilitation he met with a dietician to discuss diet goals.  (R. at 580.)  On March 13, 2006, Plaintiff reported to Nurse Rutan that he was struggling with cardiac rehabilitation and was experiencing leg, back, and neck pain.  (R. at 572.)  Plaintiff weighed 216 pounds at this time.  (*Id.*)  In June 2006, Plaintiff saw Dr. Goodwin for treatment of his sleep apnea.  (R. at 577.)  Dr. Goodwin noted that Plaintiff's weight was up fifteen pounds over the past year.  (*Id.*)  Plaintiff reported feeling refreshed on his CPAP machine.  (*Id.*)

Plaintiff saw Dr. Howser again in June 2006.  (R. at 575.)  Plaintiff reported three episodes of chest pain, which occurred after cutting the grass and working all day, that were relieved with nitro.  (*Id.*)  Upon physical examination, Dr. Howser noted that Plaintiff's abdomen was obese.  (R. at 576.)  Plaintiff visited Nurse Rutan on July 13, 2006.  (R. at 569.)  Plaintiff denied chest pain or shortness of breath during this appointment.  (*Id.*)

B.    Evaluations

State Agency Physician Dr. Maria P. Congbalay provided a physical residual functional capacity assessment of Plaintiff on June 12, 2004.  (R. at 438–42.)  Dr. Congbalay found Plaintiff capable of lifting twenty pounds occasionally; ten pounds frequently; standing and/or

walking about six hours in an eight-hour workday; and sitting about six hours in an eight-hour

workday.  (R. at 439.)  Dr. Congbalay indicated that Plaintiff was not capable of climbing

ladders, ropes, or scaffolds, but could frequently climb ramps and stairs, kneel, crouch, and

stoop.  (R. at 440.)  According to Dr. Congbalay, Plaintiff's carpal tunnel syndrome limited him

to occasional overhead reaching and frequent handling, fingering, and feeling with his hands.

(*Id.*)  Dr. Congbalay noted that at the time of her evaluation there were no treating or examining

source opinions on file.  (R. at 442.)

On January 4, 2006, Dr. Houser wrote a letter concerning the extent of Plaintiff's

limitations.  (R. at 532.)  Dr. Houser described the history of Plaintiff's heart condition as well as

his recent compaints of weakness, fatigue, and chest pain.  (*Id.*)  Dr. Houser noted that Plaintiff's

ejection fraction was 48% at the time of his most recent heart catheterization.  (*Id.*)  Finally, Dr.

Houser provided as follows:

> Due to the extensive nature of his coronary disease with repeat procedures to
> multiple arteries I do not feel that it is possible for him to do full time work.  Despite
> his only mildly decreased ejection fraction he is a functional class 3 with symptoms
> with fairly limited exertion.

(*Id.*)

Dr. Houser also completed a physical capacity evaluation of Plaintiff on January 4, 2006.

Dr. Houser opined that Plaintiff was capable of standing for three hours in a work day; walking

for two hours in a work day; sitting for four hours in a work day; and lifting up to ten pounds

rarely.  (R. at 533.)  Dr. Houser found Plaintiff capable of simple grasping and fine manipulation,

but could not push or pull, crawl, or climb ladders.  (R. at 534.)  According to Dr. Houser,

Plaintiff's condition was likely to deteriorate if placed under stress.  (*Id.*)

Nurse Rutan and Dr. Winfred E. Stolzfus also provided a letter and evaluation of

7

Plaintiff's physical capacity in January 2006.[3] (R. at 539–41.) The letter noted Plaintiff's various conditions including his heart disease, peripheral vascular disease, arthritis, hyperlipidemia, hypertension, and sleep apnea. (R. at 539.) It did not mention obesity. (*Id.*) According to Nurse Rutan and Dr. Stolzfus:

> [Plaintiff] is unable to return to his previous workload despite his desire. He is unable to do any significant amount of lifting nor is he able to stay in one position for any length of time due to numbness and tingling that occur both in his legs and upper extremities.

(*Id.*) Additionally, these medical providers found Plaintiff capable of standing less than one hour in a work day; walking less than one hour in a work day; sitting a total of two hours in a work day; and lifting less than five pounds rarely. (R. at 540.) They further opined that Plaintiff could not perform simple grasping, pushing and pulling, or fine manipulation, and that stress would lead to deterioration in Plaintiff's condition. (R. at 541.) They noted that their opinions were based on Plaintiff's cardiac condition. (*Id.*)

## IV. EXPERT TESTIMONY

### A. Medical Expert

Dr. Henry Maimon testified as a medical expert at the April 2007 administrative hearing. Dr. Maimon stated that he had reviewed the medical evidence and found that the record contained sufficient evidence to assess Plaintiff's medical condition. (R. at 629.) Dr. Maimon summarized Plaintiff's physical impairments focusing on Plaintiff's heart diseases, his knee and shoulder problems, and the various evaluations within the record. (R. at 629–36.) Dr. Maimon opined that Plaintiff did not meet the listing requirements for either coronary artery disease or

---

[3] Dr. Stolzfus was Plaintiff's physician at Mad River Internal Medicine during the period Plaintiff received treatment from Nurse Rutan.

musculoskeletal conditions.  (R. at 635–37.)  Dr. Maimon opined that Plaintiff was capable of light work, lifting ten to twenty pounds with no fumes, ladders, or scaffolds.  (R. at 639.)

Dr. Maimon indicated that objective data did not support the limitations that Dr. Houser placed on Plaintiff.  (R. at 633, 638.)  Dr. Maimon testimony also suggests that there were at least some problems with the opinions of Plaintiff's family physician due to a lack of support for his peripheral vascular disease diagnosis.  (*See* R. at 634–35, 637.)  Dr. Maimon acknowledged that Plaintiff's coronary disease might be causing him fatigue, chest pain, and shortness of breath.  (R. at 640–41.)

B.    Vocational Expert

Charlotta Ewers testified as a vocational expert at the administrative hearing.  Ms. Ewers classified Plaintiff's past work as a machine operator, shipping and receiving clerk, and security guard.  (R. at 642–43.)  She classified these occupations as heavy semi-skilled, heavy unskilled, and light semi-skilled respectively.  (*Id.*)  The ALJ asked Ms. Ewer to consider a hypothetical person capable of light work; no climbing of ladders, ropes, or scaffolds; occasional overhead reaching and frequent handling; and who was limited to clean air environments.  (R. at 643.)  Ms. Ewer opined that such a person could perform Plaintiff's past work as a security guard.  (*Id.*)  According to Ms. Ewers, changing Plaintiff's postural limitations from frequent to occasional did not alter this conclusion.  (R. at 644.)  Additionally, changing Plaintiff's fingering, handling, and feeling to occasional did not alter Ms. Ewer's conclusion.  (R. at 646.)  Upon questioning from Plaintiff's attorney, Ms. Ewer stated that applying the restrictions Nurse Rutan and Dr. Stolzfus placed on Plaintiff would eliminate the availability of any full-time work.  (R. at 644.)  Applying the limitations Dr. Houser assigned, Ms. Ewer indicated that Plaintiff would be unable

to perform his past relevant work.  (R. at 645.)

## V.  ADMINISTRATIVE DECISION

The ALJ issued a decision on May 9, 2007.  The ALJ determined that Plaintiff met the

disability insured status requirements from October 1, 2003, his alleged onset date, until

December 31, 2005.  (R. at 31.)   At the first step of the sequential evaluation process,[4] the ALJ

found that Plaintiff had not engaged in substantially gainful activity since October 1, 2003.  (R.

at 31.)

Next, the ALJ found that "[t]he medical evidence establishes severe impairments of

coronary artery disease, myocardial infarction, and related surgery; carpal tunnel syndrome with

surgical release; right knee medial meniscus tear and arthroscopic surgery; right shoulder

impingement with related surgery; cervical degenerative disease, associated arthritis."  (R. at

31.)  The ALJ noted that there was insufficient evidence to demonstrate that Plaintiff's

---

[4]  Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or
        equal the criteria of an impairment set forth in the Commissioner's Listing
        of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant
        perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and
        residual functional capacity, can the claimant perform other work
        available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

hypertension, sleep apnea, or peripheral nerve vascular disease was severe. (R. at 25–26.) The ALJ noted Plaintiff's height and weight in his description of Plaintiff's hearing testimony, but did not mention obesity in his discussion of Plaintiff's severe impairments or during any other portion of his decision.

At step three, the ALJ then determined that Plaintiff did not have impairments that met or equaled the level of severity described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ found Plaintiff capable of performing light work, but limited Plaintiff to:

> [N]o climbing ladders, ropes, or scaffolding; all others postural are occasional; only occasional overhead reaching and occasional handling, fingering, and feeling with hands bilaterally; no exposure to extremes of heat, cold, wetness humidity, generally obnoxious odors, fumes, gases, dust and poor ventilation; no fine movements involving very intricate use of fingers . . . .

(R. at 31.) In reaching this opinion the ALJ rejected the opinions of Drs. Houser and Stolzfus, finding the less restrictive opinions of Drs. Maimon and Congbalay to be more credible. (R. at 23–2427.)

Based on the testimony of Ms. Ewers, the ALJ concluded that Plaintiff was capable of performing his past relevant work. (R. at 30, 32.) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 32.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

11

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §
405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is
defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486
F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.
1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must
"'take into account whatever in the record fairly detracts from [the] weight'" of the
Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting
*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial
evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there
is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley
v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.
1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard,
"'a decision of the Commissioner will not be upheld where the SSA fails to follow its own
regulations and where that error prejudices a claimant on the merits or deprives the claimant of a
substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d
742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff maintains that the ALJ failed to properly consider his obesity. In particular,
Plaintiff contends that the ALJ relied too heavily on a medical expert's opinions that did not

account for obesity; failed to consider the effects of obesity as required under Social Security
Ruling 02-1p; and improperly rejected the opinions of Plaintiff's treating physicians because of
his failure to consider obesity.

**A.      Obesity**

Social Security Ruling 02-1p addresses the evaluation of obesity for the purpose of
disability claims.  The Ruling assures that the Commissioner will consider a claimant's obesity
in evaluating steps two through five of the sequential analysis.  SSR 02-1p, 2000 WL 628049, at
*3 (Sept. 12, 2003). When the medical or clinical records display a consistently high body
weight or body mass index ("BMI") an ALJ will typically rely on his or her "judgment to
establish the presence of obesity based on the medical findings and other evidence in the case
record, even if a treating or examining source has not indicated a diagnosis of obesity."  *Id.*
Obesity will qualify as a severe impairment pursuant to step two "when, alone or in combination
with another medically determinable  physical or mental impairment(s), it significantly limits an
individual's physical or mental ability to do basic work activities."  *Id.* at *4.  "[N]o specific
level of weight or BMI [] equates with a 'severe' or 'not severe' impairment."  *Id.*  The ALJ
"will do an individualized assessment of the impact of obesity on an individual's functioning
when deciding whether the impairment is severe."  *Id.*

Ruling 02-1p further recognizes that obesity may contribute to and complicate "chronic
diseases of the cardiovascular, respiratory, and musculoskeletal body systems."  *Id.* at *3.  The
Ruling also cautions against making "assumptions about the severity or functional effects of
obesity combined with other impairments" and stresses that "[o]besity in combination with
another impairment may or may not increase the severity of functional limitations of the other

impairment." *Id.* at *6.

The United States Court of Appeals for the Sixth has emphasized that "Social Security Ruling 02-01p does not mandate a particular mode of analysis." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding, in case where medical reports described claimant as morbidly obese, that "the ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity."); *see also Young v. Comm'r of Soc. Sec.*, No. 3:09 CV 1894, 2011 WL 2182869, at *7 ("The Sixth Circuit requires the ALJ to mention obesity either expressly or indirectly where the record includes evidence of obesity's effects on the claimant's impairments."). Rather, Social Security Ruling 02-01p "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Bledsoe*, 165 F. App'x at 412. Furthermore, when the record contains only a limited amount of information concerning obesity, the Sixth Circuit has indicated that an ALJ may provide less articulation. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (holding that when the claimant failed to list obesity in his application and when there was scant evidence of obesity in the record, it was sufficient for the ALJ to merely acknowledge the obesity diagnosis in his decision).

Finally, pursuant to the regulations, a claimant "must furnish medical and other evidence that [the Comissioner] can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis." 20 CFR § 404.1512. Accordingly, a claimant relying on obesity should provide evidence that obesity affected his or her ability to work. *See Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 857–58 (6th Cir. 2003) (concluding that even though

14

doctor reports indicated obesity, the claimant's failure to provide evidence that her obesity affected her ability to work meant that "the ALJ and the district court had no obligation to address [her] obesity"); *see also May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *6 (N.D. Ohio June 1, 2011) (holding that an ALJ had no obligation to address a claimant's obesity when, even though the record contained a diagnosis of obesity, he did not demonstrate "functional limitations ascribed to the condition[]").

In this case, the record provides some indication that Plaintiff was obese, but does not include overwhelming evidence. The medical evidence and Plaintiff's testimony reflect that Plaintiff is roughly 5'2" to 5'3" tall and varied in weight during the relevant time period between approximately 205 to 220 pounds. (*See e.g.*, R. at 458, 561, 618.) Plaintiff stresses that this information places his BMI within obesity levels. *See* SSR 02-1p, 2000 WL 628049, at *2 (describing clinical guidelines for obesity and associated BMIs). Select notes from Plaintiff's extensive medical record also describe Plaintiff's body type and weight problems.[5] For example, in December 2003, Nurse Rutan noted upon physical examination that Plaintiff was "short in stature with barrel chest and obtund abdomen." (R. at 340.) In March 2005, Nurse Rutan indicated that Plaintiff was moderately overweight. (R. at 549.) Rehabilitation notes following Plaintiff's November 2005 heart catheritization also suggest that Plaintiff was having problems with his weight. (R. at 573, 577, 580.) Finally, Dr. Houser physical examination notes from June 2006 state that Plaintiff's abdomen was obese. (R. at 576.) Despite these sporadic treatment notes within the medical records, however, the undersigned is unable to find, and

---

[5] It is notable that in August 2003, Dr. Terebuth described Plaintiff as having a mesomorphic body habitus, suggesting an intermediate body type. (*See* R. at 390.)

Plaintiff has not highlighted, an explicit diagnosis of obesity.

Perhaps more importantly, the record does not contain any evidence that obesity is affecting Plaintiff's ability to work. Drs. Houser and Stolzfus, as well as Nurse Rutan, provided letters with attached physical capacity evaluations containing their opinions as to Plaintiff's limitations. The letters indicated that a variety of conditions, including Plaintiff's heart condition, were limiting Plaintiff's ability to perform tasks. These letters and evaluations, however, did not mention obesity as a cause of these limitations. Additionally, Plaintiff has not directed the Court to any other portion of the medical evidence indicating that Plaintiff's obesity was impacting his ability to perform work or other tasks.

In this case, the undersigned finds that the ALJ did not err in evaluating the issue of obesity. In his decision, the ALJ explicitly referenced Plaintiff's height and weight, but did not expressly address obesity in detailing Plaintiff's impairments or functional limitations. Plaintiff, however, did not list obesity as a condition limiting his ability to work in his February 2, 2004 application for disability benefits. (R. at 252.) Plaintiff and his attorney did not emphasize obesity as one of Plaintiff's impairments during his testimony at the hearing. (*See* R. 620–28.) Additionally, Plaintiff did not provide evidence that obesity was affecting his ability to perform work, nor does there appear to be an explicit diagnosis of obesity in the record. As detailed above, no particular weight or BMI amounts to a severe impairment. The ALJ was not required to assume without evidence that obesity was affecting Plaintiff's other impairment. Under the circumstances of this case, the ALJ was not obligated to further address obesity. *See Young*, 2011 WL 2182869, at *9 ("[B]ecause there is not a single diagnosis of obesity in the record, and because Plaintiff failed to furnish evidence as to how his obesity affected his ability to work, the

ALJ was not required to give obesity any express consideration in the report."); *cf also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that ALJ did not err in failing to consider obesity where the claimant did not list obesity as an impairment, did not provide physician evidence describing her as obese, and failed to present medical opinion evidence that her weight imposed additional limitations or exacerbated her other conditions).

Furthermore, even assuming the record evidence was sufficient to create a duty for the ALJ to address obesity, given the lack of evidence that obesity was exacerbating Plaintiff's conditions, any failure to address the matter more fully was harmless error in this case. *See Callicoatt v. Astrue*, 296 F. App'x 700, 702 (10th Cir. 2008) (finding that even if reference to weight in the medical record created an affirmative duty to consider obesity, failure to do so was harmless error when the claimant provided "no evidence . . . showing that her obesity exacerbated her other impairments"); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that although references to weight should likely have alerted the ALJ to the claimant's obesity, an ALJ's failure to explicitly consider obesity was harmless when the claimant failed to "specify how his obesity further impaired his ability to work").

### B.    Medical Opinion Evidence

Although Plaintiff frames his Statement of Errors in terms of the ALJ's failure to consider obesity, he also challenges the ALJ's weighing of the opinion evidence.  Plaintiff contends that the ALJ erred in relying on the medical expert opinion and rejecting the opinions of Drs. Houser and Stoltzfus, who indicated that Plaintiff was incapable of doing his past work. The undersigned disagrees with this contention.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case.  20 C.F.R. § 404.1527(d).  In weighing medical opinions the ALJ must generally consider the nature of the relationship the source has with the claimant (*e.g.*, examining, treating); the supportability of the opinion; the consistency of the opinion with the record as a whole; any relevant specialization; and any other factor that supports or contradicts the opinion evidence.  *Id*.  Certain types of opinions, however, are normally entitled to greater weight. *Id*. For example, the ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R.

§ 404.1527(d)(2); *Blakley*, 581 F.3d at 408.

If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). The Sixth Circuit, however, has noted:

> On the other hand, a Social Security Ruling explains that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent [] with other substantial evidence in the case record." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson* [*v. Comm'r Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)]; *see also* 20 C.F.R. § 404.1527(d)(2).

*Blakley*, 581 F.3d at 406.

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).

Here, the ALJ did not err in weighing the medical evidence.  First, the ALJ's reasoning was sufficiently specific to satisfy the good-reason rule.  The ALJ highlighted that the record contained various assessments of Plaintiff's capability.  In weighing the various medical opinions, the ALJ recognized Drs. Houser and Stoltzfus as treating physicians.  Nevertheless, the ALJ refused to give the opinions of Drs. Houser and Stoltzfus either controlling or deferential weight because substantial evidence did not support the functional limitations they assigned to Plaintiff.  The ALJ relied on the testimony of Dr. Maimon, the medical expert, to find that the objective medical evidence and clinical findings did not support the severity of the treating physicians' opinions.  The ALJ also noted that it appeared that Drs. Houser and Stoltzfus were too reliant on Plaintiff's subjective complaints and allegations.

Second, substantial evidence supports the ALJ's decision. Specifically, Dr. Maimon's testimony provided the ALJ with significant evidence that undermined the treating physicians' opinions.  At the administrative hearing, Dr. Maimon presented testimony suggesting Plaintiff could do a restricted amount of light work.  (R. at 638–39.)  This opinion is generally consistent with the opinions of Dr. Congbalay, the state agency reviewing physician.[6]  (R. at 438–42.)  Dr.

---

[6] Plaintiff is correct that Dr. Congbalay issued her opinions prior to Plaintiff's 2005 heart catheritization.  Dr. Congbalay also was not able to review the treating physician opinions, which were given at a later time.  Nevertheless, her medical opinion is still at least somewhat

Maimon offered his opinion after reviewing all of the medical exhibits in Plaintiff's file. (R. at 628–29.) Furthermore, at the hearing, Dr. Maimon performed a thorough overview of the record and demonstrated that he was aware of the treating physician opinions. (R. at 629–35.)

Dr. Maimon indicated that objective data did not support the opinions of these physicians and that these opinions were overly restrictive. Dr. Maimon pointed out that the testing upon which Dr. Houser relied demonstrated only a mildly decreased ejection fraction and further implied that the objective data did not support Dr. Houser's opinion. (R. at 633, 638, 640.) Dr. Maimon also noted that there was no objective evidence of peripheral vascular disease, a condition upon which Dr. Stoltzfus partially relied upon in issuing his opinion. (R. at 634–35.) In light of Dr. Maimon's testimony, the ALJ was at least reasonable in rejecting the treating physician opinions as overly restrictive and unsupported by objective medical evidence and clinical findings. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 516 (6th Cir. 2010) (providing that the substantial-evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts") (internal quotations omitted).

Plaintiff maintains that the ALJ erred in relying on Dr. Maimon's opinion and by rejecting the opinions of his treating physicians. Plaintiff assumes that the treating physician opinions are more restrictive because the treating physicians considered Plaintiff's obesity and Dr. Maimon did not. The record evidence does not support this supposition. First, there is no indication that Dr. Maimon failed to account for Plaintiff's weight in reaching his opinions. Dr.

---

persuasive, as it was given in the relevant time period and generally supports the opinions of Dr. Maimon.

Maimon was present at the hearing and reviewed Plaintiff's medical record, and, therefore, was presumably aware of Plaintiff's weight and body type.  Although Dr. Maimon did not mention that Plaintiff was obese in his hearing testimony, this condition was not a focus of the medical evidence.

Second, the treating physician opinions did not indicate that obesity was limiting Plaintiff's functioning.  Dr. Houser's January 4, 2006 letter state that his opinions were "[d]ue to the extensive nature of his coronary disease with repeat procedures to multiple arteries . . . ."  (R. at 532.)  The letter also suggests that Dr. Houser was relying heavily on Plaintiff's subjective complaints of fatigue, weakness, and chest pain.  (*Id.*)  Although Dr. Stoltzfus' January 16, 2006 letter suggests that his opinions are based on a variety of Plaintiff's conditions, obesity is not among the conditions Dr. Stolzfus lists.  (R. at 539.)  Accordingly, the record provides little, if any, reason to conclude that the restrictiveness of the treating physicians' opinions was due to Plaintiff's obesity.

## VIII.  CONCLUSION

Based on the record as a whole, substantial evidence support the ALJ's decision in this case.  For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   January 5, 2012                         */s/ Elizabeth A. Preston Deavers*
                                                                  Elizabeth A. Preston Deavers
                                                                  United States Magistrate Judge